**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**PHYLLIS DENISE CARTER,**

**Plaintiff,**

**v.**

**CAROLYN W. COLVIN,**
**ACTING COMMISSIONER,**
**SOCIAL SECURITY ADMINISTRATION,**

**Defendant.**

**CIVIL ACTION NO. 4:13-cv-171**

## REPORT AND RECOMMENDATION

Plaintiff Phyllis Denise Carter ("Ms. Carter") filed a complaint pursuant to 42 U.S.C. § 405(g) that seeks judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner" or "Defendant"), which denied Ms. Carter's claim for Disability Insurance Benefits ("DIB") pursuant to Title II, and her claim for Supplemental Social Security Income ("SSI") pursuant to Title XVI of the Social Security Act. Both parties filed motions for summary judgment, ECF Nos. 15 and 18, with briefs in support, ECF Nos. 15 and 19, which are now ready for resolution.

This action was referred to the undersigned United States Magistrate Judge by order from the United States District Judge, *see* ECF No. 13, pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned disposes of the cross motions for summary judgment without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following

reasons, the undersigned **RECOMMENDS** that Ms. Carter's motion for summary judgment, ECF No. 15, be **DENIED**; the Defendant's motion for summary judgment, ECF No. 18, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Ms. Carter filed applications for DIB and SSI on January 7, 2011, originally alleging a disability onset date of May 1, 2009, due to cardiomyopathy. R. 94.[1] This application was initially denied on April 1, 2011, and denied again upon reconsideration on July 28, 2011. R. 105, 131. Ms. Carter requested a hearing in front of an administrative law judge ("ALJ") on May 17, 2012, which was held on July 12, 2012. R. 61, 69. The ALJ issued his decision on August 3, 2012, denying Ms. Carter's applications. R. 38. The Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Ms. Carter's request for review of the ALJ's decision on October 11, 2013. R. 23. After exhausting her administrative remedies, Ms. Carter filed her complaint for judicial review of the Acting Commissioner's final decision on April 24, 2014. ECF No. 5. The Acting Commissioner filed an answer on July 17, 2014. ECF No. 11. Both parties filed motions for summary judgment. ECF Nos. 15 and 18. Following the submission of the summary judgment briefs, the Fourth Circuit Court of Appeals issued its decision in *Mascio v. Colvin,* 780 F.3d 632 (4th Cir. 2015), and this Court issued an Order directing the parties to submit supplemental briefs addressing the impact, if any, of *Mascio* on Ms. Carter's claims. ECF No. 20. Because both parties have now done so, ECF Nos. 21 and 23, the matter is ripe for adjudication.

---

[1] "R." refers to the certified administrative record that was filed under seal on July 17, 2014 pursuant to Local Civil Rule 5(b) and 7(C)(1).

## II. RELEVANT FACTUAL BACKGROUND

In her application, dated January 7, 2011, Ms. Carter alleged a disability onset date of May 1, 2009. R. 94. At the time of the ALJ's decision, Ms. Carter was a 37-year-old female who graduated from high school, received training as a certified nursing assistant ("CNA"), and worked in the past as a CNA in nursing homes. R. 77, 141, 244, 249, 271-72. At the hearing held on July 12, 2012, Ms. Carter supplemented her medical records by providing additional information via testimony. The record included the following factual background for the ALJ to review:

Ms. Carter resides in an apartment with four of her five children—ages 14, 14, 16, and 17. R. 73. In order to reach the second-story apartment, Ms. Carter must climb one flight of stairs, which she struggles to do without stopping for a break halfway up the stairs. R. 84. Similarly, Ms. Carter can only walk about half a block without stopping because her heart rate increases. R. 88. After ten minutes of standing, Ms. Carter begins to feel dizzy; after twenty to thirty minutes of sitting Ms. Carter's back begins to spasm. R. 88-89. Additionally, Ms. Carter testified that she has trouble sleeping due to shortness of breath and chest discomfort. R. 85.

Ms. Carter's daughter usually prepares meals for the family, under the direction of Ms. Carter. R. 84. Ms. Carter performs basic household cleaning, such as dusting and vacuuming, but needs to take breaks after about five minutes. R. 84. Ms. Carter's children usually help with household chores as well. R. 84. Despite her impairment, Ms. Carter owns and drives a vehicle, shops for groceries, attends doctor appointments, and occasionally meets her children at school. R. 83.

From 2010 to 2011, Ms. Carter worked for Coliseum Park Nursing Home as a CNA. R. 75. Ms. Carter previously performed CNA services in Pennsylvania, dating back to 2000, with

Heartland Employment and Manor Care Health Services. R. 76-77. She discontinued her employment in 2011 when her doctors "said [Ms. Carter] couldn't work anymore because of the stress on [her] heart from the cardiomyopathy." R. 76.

Ms. Carter's medical records reveal a history of cardiomyopathy, initially diagnosed in 1999. R. 305. In 2008, she began treatment with Dr. Andrew Waxler at Berks Cardiologists, Ltd. R. 303-16. On January 8, 2008, Dr. Waxler ordered a Multi Gated Acquisition Scan (MUGA) that revealed "severe septal hypokinesis, mild inferior wall hypokinesis and overall normal left ventricular systolic function," with an ejection fraction of 57 percent. R. 303. On January 18, 2008, Dr. Waxler stated that Ms. Carter "continues to do very well and has remained otherwise completely asymptomatic." R. 304. Ms. Carter denied "any significant chest pain, shortness of breath . . . dizziness, lightheadedness, presyncope or palpitations." R. 304. Dr. Waxler ordered an echocardiogram ("Echo") for further analysis, R. 306, which showed "mild left ventricular dilation" and "mildly reduced left ventricular systolic function"—an improvement over a previous Echo. R. 311, 314. On January 29, 2008, Dr. Waxler reported that, "Mrs. Carter says she feels fine. She is active and asymptomatic." R. 314.

Following a referral from Dr. William Franklin, her primary care physician, Ms. Carter began treatment with Dr. Derrick Ridley at Hampton Roads Cardiology. R. 351. On October 15, 2009, Ms. Carter reported symptoms of "exertional dyspnea, fatigue, three pillow orthopnea, lower extremity edema, and occasional brief palpitations." R. 351. She denied substernal chest pain, chest pressure with exertion, paroxysmal nocturnal dyspnea, claudication, pre-syncope, or syncope. R. 351. Dr. Ridley's examination revealed no cardiomegaly or thrills, a regular heart rate and rhythm, no murmurs or gallops, and clear lungs. R. 353.

On October 19, 2009, Ms. Carter underwent a Nuclear Stress Test. R. 367. She reported feeling "whoozy" during the test, and her left ventricle appeared enlarged both on stress and at rest. R. 367. Images showed a mild to moderate fixed defect and hypokinesis, with a left ventricle ejection fraction of 35 percent. R. 367.

On October 22, 2009, Ms. Carter followed up with Dr. Ridley to review her test results. R. 349. Dr. Ridley noted that Ms. Carter's Echo was abnormal and revealed mild left ventricular dilation, moderate diffuse left ventricular hypokinesis, and an estimated left ventricular ejection fraction of 40 percent. R. 349. He advised Ms. Carter to quit smoking, perform regular exercise, and maintain a healthy diet. R. 349.

On December 2, 2009, Ms. Carter followed up with Dr. Ridley. R. 342. She denied symptoms of "orthopnea, paroxysmal nocturnal dyspnea, fatigue, lower extremity edema, chest pain, chest pressure, palpitations, tachycardia, syncope, or pre-syncope." R. 342. On physical examination, Ms. Carter's heart was normal, with the exception of an S4 gallop. R. 343. Dr. Ridley again provided diet and smoking counseling, and he scheduled a follow-up appointment in six months. R. 344.

On June 3, 2010, Ms. Carter followed up with Dr. Ridley. R. 339. She had no complaints of "decompensation or coronary insufficiency," and she denied "chest pain, chest pressure, shortness of breath, dyspnea on exertion, orthopnea, paroxysmal nocturnal dyspnea, syncope, or presyncope." R. 339. Dr. Ridley again heard an S4 gallop, but Carter's heart was otherwise normal. R. 340. An electrocardiogram (EKG) revealed a normal sinus rhythm and nonspecific T-wave changes. R. 341. Dr. Ridley diagnosed "dilated cardiomyopathy" and "habitual tobacco use." R. 341. He once again counseled Ms. Carter on smoking cessation, and he scheduled another follow-up appointment in six months. R. 341.

On November 28, 2010, Ms. Carter was admitted to the emergency department of Sentara Careplex Hospital with complaints of chest pain, shortness of breath, and edema. R. 318. She reported that she had stopped taking her medications six months earlier. R. 319. Ms. Carter described moderate pain and constant pressure, and she was diagnosed with cardiomyopathy and anemia. R. 319-20. Her heart rate and rhythm were regular, she had no murmurs, rubs, or gallops, and her peripheral pulses were 2+ and equal. R. 321. Plaintiff's lungs were clear to auscultation bilaterally with no wheezes, rales, or rhonchi. R. 321. In addition, she had full range of motion in all extremities. R. 321. An EKG showed abnormally inverted T waves laterally, reflective of "no significant changes" from her previous EKG. R. 323. Hospital staff assessed that Ms. Carter was not having an acute medical emergency that required emergency medical intervention or hospital admission for further monitoring. R. 324. Ms. Carter felt better at the time of discharge and received prescriptions for her medications with instructions to follow up with Dr. Ridley. R. 319, 324.

On December 2, 2010, Ms. Carter followed up with Dr. Ridley. R. 335. She reported feeling "as if she had a ton of bricks laying on [her] chest." R. 335. Her other symptoms included more frequent "shortness of breath, lower extremity edema, orthopnea, and paroxysmal nocturnal dyspnea." R. 335. Dr. Ridley's examination revealed "no cardiomegaly or thrills; regular heart rate and rhythm, no murmurs or gallops" and clear lungs. R. 337. An Echo revealed a "significant decrease in the ventricular systolic function" with an estimated left ventricular ejection fraction of 26 percent. R. 337. Ridley refilled Ms. Carter's prescriptions, recommended an automatic implantable cardioverter defibrillator (AICD), and urged Ms. Carter to quit smoking. R. 337-338.

Ms. Carter also continued treatment with Dr. Franklin, her primary care physician. R 372-84; 388-91; 395-404; 412-22; 434-44; 453-68; 488-91; 494-501; 515-22. On March 7, 2011, Dr. Franklin signed a "Disability Certificate" for Ms. Carter's employer, Coliseum Park Nursing Home, stating that Ms. Carter "was totally incapacitated" from March 3, 2011, through March 13, 2011, and could return to "regular work duties" on March 14, 2011. R. 374. On March 14, 2011, Dr. Franklin signed another "Disability Certificate" indicating that due to lumbar radiculopathy, Ms. Carter "was totally incapacitated" from March 14, 2011, through March 21, 2011. R. 442. On March, 21, 2011, Dr. Franklin signed a third "Disability Certificate" stating that Ms. Carter "was totally incapacitated" from March 21, 2011, through April 4, 2011. R. 453.

On March 24, 2011, Dr. Franklin completed a Residual Functional Capacity (RFC) Questionnaire regarding Ms. Carter's impairments. R. 423. He identified her symptoms as including chest pain, shortness of breath, lower extremity edema, orthopnea, paroxysmal nocturnal dyspnea, and opined that her symptoms are "constantly" severe enough to interfere with the attention and concentration required to perform simple work-related tasks. R. 423. In the evaluation, Dr. Franklin suggested that she could not walk a single city block without rest or significant pain, she could not sit for more than zero minutes at a time, and she could not stand or walk for more than zero minutes at a time. R. 423. He opined she would need to take unscheduled breaks during an 8-hour workday, and when asked how often she would need these breaks, he reiterated that she simply should not work. R. 423. Dr. Franklin did not complete the entirety of the questionnaire, including assessments of how much Ms. Carter could lift and carry, or the frequency that her work required the use of her hands, fingers, and arms. R. 424. Instead, Dr. Franklin appears to have based his recommendations on Ms. Carter's reported symptoms and

an old Echo from December 2, 2010, revealing an ejection fraction of 26 percent. R. 423-24. Nonetheless, Dr. Franklin concluded that "she should NOT work at this time." R. 423 (emphasis original).

At the initial level of review, state agency physician Dr. Michael Cole, reviewed the evidence of record. R. 98-102. Dr. Cole noted that Ms. Carter had credible limitations with standing, walking, and stair climbing, but that she could do household chores, cook, shop, and take care of her children. R. 100. He further noted that Dr. Franklin's opinion that Ms. Carter could not work was an issue reserved to the Commissioner, and he gave controlling weight to Dr. Franklin's prior opinion that Ms. Carter could return to regular work duties on March 14, 2011. R. 100. Dr. Cole then assessed Ms. Carter's RFC and found she could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 4 hours; sit about 6 hours; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and frequently stoop and crouch; and should avoid concentrated exposure to temperature extremes and even moderate exposure to hazards. R. 101-02. Accordingly, Dr. Cole's RFC conflicted with the evaluation prepared by Dr. Franklin. R. 101-02. Dr. Cole justified this variation because Dr. Franklin's opinion was "without substantial support from other evidence of record, which renders it less persuasive." R. 103.

Thereafter, Dr. Franklin issued another statement on April 4, 2011, indicating that Ms. Carter was under his care for cardiomyopathy and lumbar radiculopathy, and due to her cardiomyopathy, she was unable to work. R. 466. He opined that she was totally incapacitated from this condition and was following treatment with a cardiologist. R. 466.

On June 2, 2011, Ms. Carter followed up with Dr. Ridley at Hampton Roads Cardiology for dyspnea and episodes of substernal oppressive chest pains. R. 425. She denied having

"paroxysmal nocturnal dyspnea, palpitations, tachycardia, syncope, or presyncope." R. 425. On physical examination, Ms. Carter showed no cardiomegaly or thrills, and a regular heart rate and rhythm with no murmurs or gallops. R. 427. Dr. Ridley recommended that Ms. Carter continue with medical therapy, restart Coumadin, and adhere to a low sodium diet. R. 427.

On July 28, 2011, at the reconsideration level of review, Dr. Josephine Cader, reviewed the evidence of record. R. 125-28. Dr. Cader concurred with Dr. Cole's assessment and found Ms. Carter's limitations partially credible, but explained that she was not so limited that she could be considered disabled. R. 126-27. Similarly, Dr. Cader noted that Dr. Franklin's opinions were unsupported by the record and opined on issues reserved to the Commissioner. R. 129. Dr. Cader also concurred with Dr. Cole's RFC assessment. R. 127-28.

On September 1, 2011, Dr. Franklin completed an updated RFC Questionnaire. R. 469-71. His indication of symptoms was unchanged, and he again opined that Ms. Carter was unable to work. R. 470. Dr. Franklin maintained that Ms. Carter could not walk a single city block without rest or significant pain, she could not sit for more than zero minutes at a time, and she could not stand or walk for more than zero minutes at a time. R. 470. As with his previous evaluation, Dr. Franklin did not complete the entirety of the questionnaire and did not assess how much Ms. Carter could lift and carry, or the frequency that her work required the use of her hands, fingers, and arms. R. 470. It again appears that Dr. Franklin based his recommendations on Ms. Carter's reported symptoms and an old Echo from December 2, 2010, revealing an ejection fraction of 26 percent. R. 470-71.

On November 16, 2011, Ms. Carter was admitted to the hospital for syncope with a history of severe cardiomyopathy. R. 475. Ms. Carter underwent an updated Echo, which revealed a left ventricular ejection fraction of 20 percent with severe global hypokinesis. R. 482.

The hospital staff recommended an AICD for "primary prevention" based on her "nonischemic cardiomyopathy, chronic systolic heart failure, and ejection fraction less than 30% for more than 9 months." R. 473. The procedure was conducted successfully while in the hospital, and Ms. Carter was discharged the following day after displaying no symptoms. R. 482.

On November 30, 2011, Dr. Franklin signed another RFC Questionnaire. R. 485-86. The form indicates that Ms. Carter would not be able to work in her lifetime, and also noted the recent surgery for the AICD. R. 485-86. Dr. Franklin still asserted that Ms. Carter could not walk a single city block without rest or significant pain, she could not sit for more than zero minutes at a time, and she could not stand or walk for more than zero minutes at a time. R. 485. As with his previous evaluations, he did not assess how much Ms. Carter could lift and carry, or the frequency with which her work required the use of her hands, fingers, and arms. R. 486. Dr. Franklin notes the ejection fraction from December 2, 2010, but does not mention the most recent Echo or discuss how Ms. Carter's surgery could affect her RFC. R. 484-85.

On December 1, 2011, Ms. Carter followed up with Dr. Ridley. R. 507-10. Ms. Carter reported mild dyspnea on exertion, but she had no complaints of "chest pain, chest pressure or chest tightness. R. 507. Additionally, she denied orthopnea, paroxysmal nocturnal dyspnea, syncope, or claudication. R. 507. Dr. Ridley's examination revealed no cardiomegaly or thrills, and a regular heart rate and rhythm with no murmurs or gallops. R. 509. An Echo revealed moderately reduced left ventricular systolic function, mild left ventricular dilation, and trace mitral and tricuspid regurgitation with normal right heart pressures. R. 509, 511. Ms. Carter's ejection fraction had improved to 36 percent (from 20 percent on November 16, 2011, and 26 percent on December 2, 2010). R. 509, 511. Dr. Ridley recommended that Ms. Carter have her

AICD checked, continue her medical therapy, and schedule a follow-up appointment in six months. R. 510.

On May 31, 2012, Ms. Carter followed up with Dr. Ridley. Ms. Carter reported no "chest pain, chest pressure, shortness of breath, dyspnea on exertion, orthopnea and paroxysmal nocturnal dyspnea, palpitations, tachycardia, syncope or presyncope." R. 524. The physical examination revealed no cardiomegaly or thrills, and a regular heart rate and rhythm with no murmurs or gallops. R. 526. Dr. Ridley increased Plaintiff's beta blocker dose and had her continue her other medications unchanged. R. 526. He scheduled a follow-up appointment in six months. R. 527.

## III. ALJ's FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro*, 270 F.3d at 177. The ALJ conducts this five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong*, 2011 WL 2938084, at *3 (citing 20 C.F.R. §§ 404.1520, 416.920). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to

questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, in determining whether Ms. Carter engaged in substantial gainful activity ("SGA"), the ALJ considered the statements of a payroll employee for Coliseum Park Nursing Home, Ms. Carter's former employer, that Ms. Carter performed work and received wages in an amount that the ALJ would have considered consistent with substantial gainful activity. R. 43. Because Ms. Carter testified that she only worked eighteen hours per week, the ALJ gave Ms. Carter "the benefit of the doubt . . . by deciding the issue of disability at a later step." R. 43. Second, the ALJ found that Ms. Carter had the severe impairment of cardiomyopathy. R. 44. The ALJ went on to find that the "impairment results in intermittent chest pain, occasional shortness of breath and fatigue, which significantly limit [Ms. Carter's] ability to perform basic work activities by restricting her capacity to lift, carry, walk, stand, push and pull." R. 44. Third, the ALJ found that Ms. Carter did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 44. Specifically, the ALJ found that "record does not document cardiac enlargement resulting in an inability to carry on any physical activity or any other symptoms that fulfill the requirements of Listing 4.02." R. 44. Additionally, the ALJ found "no evidence of ischemic heart disease with the symptoms necessary to meet the criteria of Listing 4.04." R. 44. Fourth, the ALJ found that Ms. Carter has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), with the exception that she "can push and pull no more than ten pounds with her upper and lower extremities." R. 45. Fifth, while Ms. Carter is unable to perform any past relevant work, the

ALJ found that considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Carter could perform. R. 48-50. Therefore, the ALJ determined that Ms. Carter has not been under a disability from May 1, 2009, through August 3, 2012, the date of the ALJ's decision. R. 50.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the Acting Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *see also Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *2 (D.S.C. June 27, 2011) (requiring reversal if decision fails to provide sufficient analysis to establish proper application of the law) (internal citations omitted).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Acting Commissioner's findings as to any fact, if the

findings are supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. Moreover, the Acting Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays*, 907 F.2d at 1456-57. Overall, if the Acting Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the Court is to affirm the Acting Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996) (granting the Commissioner latitude in resolving inconsistencies in the evidence, which the Court reviews for clear error or lack of substantial evidence). However, "[t]he court may remand a case to the Commissioner for a rehearing under sentence four . . . of 42 U.S.C. §405(g)" if the ALJ does not provide substantial support for his decision, or if the ALJ incorrectly applies the law. *Strong*, 2011 WL 2938084, at *2 (citing *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision); *Jackson v. Chater*, 99 F.3d 1086, 1090-91 (11th Cir. 1996)). "The [Commissioner] and the claimant may produce further evidence on remand." *Strong*, 2011 WL 2938084, at *2 (citing *Smith v. Heckler*, 782 F.2d 1176, 1182 (4th Cir. 1986)).

## V. ANALYSIS

Ms. Carter seeks judicial review of the Acting Commissioner's final decision, asserting four claims of error: (1) the ALJ failed to "properly evaluate [Ms. Carter]'s impairment at Step 3 of the sequential evaluation, despite substantial evidence that her condition meets or equals Listing 4.02 for Chronic Heart Failure;" (2) "[t]he ALJ's residual functional capacity finding is unsupported by substantial evidence;" (3) "[t]he ALJ failed to apply the appropriate legal standard sin assessing [Ms. Carter]'s credibility;" and (4) "[t]he ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error." ECF No. 15 at 3.

First, Ms. Carter claimed that the ALJ did not compare her condition to the requirements of Listing 4.02, but instead made only a conclusory statement that "'the records do not document heart failure with the frequency and severity required by Listing 4.02.'" *Id.* at 13 (quoting R. at 44). Second, Ms. Carter claimed that the ALJ's residual functional capacity finding was incorrect because he did not give proper weight to the opinion of Dr. Franklin, Ms. Carter's treating physician. *Id.* at 16. Third, Ms. Carter claimed that the ALJ did not articulate specific and adequate reasons for finding that her testimony lacked credibility. *Id.* at 20. Fourth, Ms. Carter claimed that the ALJ erred in his Step 5 determination because he relied on a vocational expert's response to a hypothetical set of impairments that did not adequately reflect Ms. Carter's condition, according to her testimony and Dr. Franklin's assessments. *Id.* at 21.

In opposition to these allegations, the Acting Commissioner argued that the ALJ properly considered the evidence and applied appropriate legal standards at each stage of the analysis. First, the Acting Commissioner asserted that "the ALJ was not required to consult with a medical expert regarding whether [Ms. Carter] met or medically equaled the listing's requirements." ECF No. 19 at 15. However, the ALJ did rely on assessments made by the state agency medical experts, Drs. Cole and Calder. *Id.* Second, the Acting Commissioner argued that the ALJ properly discounted the Dr. Franklin's opinions on Ms. Carter's disability because his opinions were "not supported by the clinical findings . . . , the documented improvement in [Ms. Carter]'s condition with treatment, or by [Ms. Carter]'s statements to her treating cardiologist, Dr. Ridley." *Id.* at 18. Third, the Acting Commissioner contended that the ALJ articulated several specific and adequate reasons for doubting Ms. Carter's testimony, including her statements to Dr. Ridley, her medical records, her failure to undergo treatment, and inconsistencies between her reported restricted daily activities and the documented improvement of her symptoms with

treatment. *Id.* at 20. Fourth, the Acting Commissioner stated that the ALJ properly limited the scope of his hypothetical question to the vocational expert because the question "must include only those limitations supported by the record." *Id.* at 19.

**A. The ALJ did not err in determining that Ms. Carter's impairments did not meet the requirements of Listing 4.02.**

In the first claim of error, Ms. Carter argued that the ALJ failed to compare her impairments to the requirements of Listing 4.02. According to Ms. Carter, a proper analysis would have found that her chronic heart failure was severe enough to meet or medically equal Listing 4.02. The Acting Commissioner replied that the ALJ properly considered Ms. Carter's medical condition, but found that her symptoms fell short of the specified medical criteria.

"The 'listings' is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" *Bennett v. Sullivan*, 917 F.2d 157, 160 (4th Cir. 1990) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). The purpose of the listings is to describe certain impairments that are "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." *Bennett*, 917 F.2d at 160. The disability listing at issue, 4.02, lists the following requirements:

A. Medically documented presence of one of the following:

> 1. Systolic failure, with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure, with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

> AND
>
> B. Resulting in one of the following:
>
> > 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
> >
> > 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period, with evidence of fluid retention from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization; or
> >
> > 3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less . . .

20 C.F.R. § 404 Subpart P, App. 1, Listing 4.02 (internal references omitted).

The "[p]laintiff has the burden of proving that she meets or equals a listing." *Henry v. Colvin*, No. 3:13-cv-357, 2014 WL 856358, at *7 (E.D. Va. March 4, 2014) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5. (1987)). However, "[t]he ALJ has the duty to fully and fairly develop the record." *Strong*, 2011 WL 2938084, at *5 (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). "Thus, [the ALJ] will carefully examine the statements [she] provide[s] to determine if they are consistent with the information about, or general pattern of, the impairment as described by the medical and other evidence, and to determine whether additional information about [her] functioning is needed from [her] or other sources." 20 C.F.R. § 404 Subpart P, App. 1 § 12.00(D)(1)(b).

"The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled." *Strong*, 2011 WL 2938084, at *6 (citing 20 C.F.R. §§ 404.1517, 416.917); *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). "A consultative examination is warranted when there is an inconsistency in the evidence or 'when the evidence as a whole is insufficient to allow us to make a determination or decision' on a claim." *Hoy v. Colvin*, No. 5:12cv70, 2013 WL 4010647, at *4 (W.D. Va. Aug. 5, 2013) (*citing* 20 C.F.R. §§ 404.1519(a), 416.919(a)). "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Huddleston v. Astrue*, 826 F. Supp. 2d 942, 958 (S.D. W. Va. 2011) (quoting *Ripley v. Chater*, 67 F. 3d 552, 557 (5th Cir. 1995)).

The ALJ's assessment of Ms. Carter's condition with respect to the Listing considered a number of factors:

> The record does not document cardiac enlargement resulting in an inability to carry on any physical activity or any other symptoms that fulfill the requirements of Listing 4.02. There is no other evidence of ischemic heart disease with the symptoms necessary to meet the criteria of Listing 4.04. An echocardiogram from December 2011 showed moderately reduced left ventricular systolic function with an ejection fraction of 36%, which had improved from 26% since December 2010). [sic] Treatment records note a history of severe dilated cardiomyopathy with chronic systolic heart failure but the records do not document heart failure with the frequency and severity required by Listing 4.02. In June 2012, the claimant denied having hypertension, coronary artery disease or a prior myocardial infarction. The claimant has a pace maker and the examination in June 2012 noted a regular heart rate and regular heart rhythm with no cardiomegaly, murmurs or gallops. The claimant's lungs were clear to auscultation and percussion. The claimant's reported symptoms were addressed with adjustments to her medications. (Exhibit 15F).
>
> Additionally, there are no findings that may be substituted for the absent criteria in the above-cited listings or in any other relevant medical listing. Therefore the claimant's impairment does not meet or medically equal the requirements of any impairment listed in 20CFR Part 404, Subpart P, Appendix 1.

R. at 44.

The ALJ specifically referenced Listing 4.02 and applied Ms. Carter's medical impairments to the requirements of the listing. He did not quote from the requirements, but the ALJ did consider Ms. Carter's condition in relation to several factors set forth in the Listing. He discussed Ms. Carter's ejection fraction—relevant under requirement (A)(1). The ALJ referenced Ms. Carter's most recent ejection fraction of 36 percent in December 2011, but acknowledged that one year before, in December 2010, her ejection fraction had been 26 percent. The ALJ did not mention that Ms. Carter had an ejection fraction of 20 percent on November 16, 2011, or that her ejection fraction was under 30 percent for approximately nine months. Moreover, the ALJ's written opinion did not clearly indicate whether Ms. Carter met the requirement under 4.02(A).

Nonetheless, even if Ms. Carter did satisfy a 4.02(A) requirement, she would then have to establish that one of the three qualifying circumstances under 4.02(B) applied—none of which have been proven. In fact, in her memorandum in support of her motion for summary judgment, Ms. Carter only seems to advance 4.02(B)(3)—inability to perform on an exercise tolerance test at a workload equivalent of 5 METS or less—by referencing a "whoozy" feeling during a Nuclear Stress Test, administered on October 19, 2009. In October 2009, however, two tests showed her ejection fraction at 35 percent and 40 percent. Even if the Nuclear Stress Test did satisfy requirement 4.02(B)(3), she would not have qualified under 4.02(A) at the time.

The other two possibilities under 4.02(B) do not seem to apply. The first requires "persistent symptoms of heart failure which seriously limit the ability to independently . . . complete activities of daily life *in an individual for whom a medical consultant has concluded that the performance of an exercise test would present a significant risk to the individual.*" 20 C.F.R. § 404 Subpart P, App. 1, Listing 4.02(B)(1) (emphasis added). The record does not

reflect any such conclusion from a medical consultant. Additionally, as the ALJ noted, Ms. Carter consistently denied having symptoms such as "hypertension, coronary artery disease or a prior myocardial infarction." R. 44. The ALJ also discussed the daily functions of Ms. Carter in another section of his written opinion that would prevent 4.02(B) from applying. The second requires "three or more separate episodes of acute congestive heart failure within a consecutive 12-month period." 20 C.F.R. § 404 Subpart P, App. 1, Listing 4.02(B)(2). The ALJ noted that "the records do not document heart failure with the frequency and severity required." R. 44.

Ms. Carter further argued that "the ALJ should have consulted with a medical expert to determine whether [she] met or medically equaled the requirements of [the] listing." ECF. No. 15 at 15. Ms. Carter has not shown that the record failed to provide the ALJ with sufficient medical evidence about her impairments to determine whether she was disabled. Additionally, she has not established prejudice by showing that additional evidence would have been produced if the ALJ had more fully developed the record, and that the additional evidence might have led to a different decision.

For the above reasons, the undersigned FINDS that substantial evidence supports the ALJ's determination that Ms. Carter's impairments did not satisfy the requirements under Listing 4.02, and that the ALJ provided an adequate explanation of his reasoning in his written opinion.

**B. The ALJ did not err by giving no significant weight to Dr. Franklin's opinions.**

In the second claim of error, Ms. Carter argued that the ALJ should have assigned greater weight to the opinion given by her treating physician, Dr. Franklin. ECF No. 15 at 16. Specifically, Dr. Franklin issued several opinions stating that Ms. Carter was unable to perform work due to her medical conditions. Generally, the Acting Commissioner's disability determination is based on the totality of the evidence in the record, including the "objective

medical evidence," and any "other evidence from medical sources, such as medical history, opinions, and statements about treatment." 20 C.F.R. § 404.1512(b). If the medical evidence, including all medical examinations by all physicians, is consistent, then the ALJ makes a determination based on all of the evidence. 20 C.F.R. § 404.1520b(a). However, if any of the evidence is inconsistent, the ALJ must decide which evidence should receive controlling weight. 20 C.F.R §§ 404.1520b(b); 404.1527. Under the "treating physician rule," a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) it is not inconsistent with other substantial evidence in the record. *See Craig*, 76 F.3d at 590; 20 C.F.R. § 404.1527(d)(2); Social Security Ruling ("SSR") 96-2p.

   If the treating source's opinion is not well-supported by medically acceptable techniques, or is inconsistent with the other substantial evidence, the treating physician's opinion will not be given controlling weight. *Baxter v. Astrue*, No. 3:11-CV-679, 2013 WL 499338, at *4 (E.D. Va. Feb. 7, 2013) (citation omitted). The treating physician's opinion will also not be given controlling weight if the physician opines on an issue reserved for the Commissioner, such as whether the claimant is disabled for employment purposes. *See Jarrells v. Barnhart*, No. 7:04–CV–411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *accord* 20 C.F.R. §§ 404.1527(d)(3), (e). If the opinion is deemed not controlling, then the ALJ determines the weight of the opinion by considering the factors in 20 C.F.R. § 404.1527: the length, nature, and extent of the treatment relationship; frequency of examinations; supportability by relevant evidence; consistency with the record as a whole; the physician's degree of specialization; and any other factors tending to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). Additionally, to determine the

claimant's RFC, the ALJ can rely on, and give weight to, the opinions of the state agency consultants, when such an opinion is consistent with the record. *See* 20 C.F.R. § 404.1527(e); *see also Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986); SSR 96-6p. The opinion and report of a non-treating, non-examining state agency consultant is not substantial evidence when it is "contradicted by all other evidence in the record." *Millner v. Schweiker*, 725 F.2d 243, 245 (4th Cir. 1984).

Here, the ALJ assigned no significant weight to the assessments of Dr. Franklin because "his conclusions were not supported by clinical findings, by the documented improvement in the claimant's condition with treatment or by the claimant's statements to her treating cardiologist." R. 48. In March, 2011, Dr. Franklin issued three "Disability Certificates" for Ms. Carter stating that she was "was totally incapacitated" and could not perform work for her employer. R. 374, 442, 453. In March, September, and November, 2011, Dr. Franklin completed a Residual Functional Capacity (RFC) Questionnaire regarding Ms. Carter's impairments, each stating that Ms. Carter was unable to work due to her impairments. R. 423, 469-71, 485-86.

First, substantial evidence supports the ALJ's conclusion that Dr. Franklin's opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Ms. Carter consistently denied paroxysmal nocturnal dyspnea, chest pain, and shortness of breath (among a number of other symptoms). R. 48. Nonetheless, when Dr. Franklin filled out an RFC Questionnaire, he identified her symptoms as including chest pain, shortness of breath, lower extremity edema, orthopnea, and paroxysmal nocturnal dyspnea, and he opined that her symptoms are "constantly" severe enough to interfere with the attention and concentration required to perform simple work-related tasks. R. 423. In each of the three RFC Questionnaires, Dr. Franklin wrote that Ms. Carter could not walk a single city block without rest or significant

pain, she could not sit for more than zero minutes at a time, and she could not stand or walk for more than zero minutes at a time. R. 423, 470, 485. Dr. Franklin did not complete the entirety of the questionnaire, including assessments of how much Ms. Carter could lift and carry, or the frequency that her work required the use of her hands, fingers, and arms. R. 424, 470, 486. Instead, Dr. Franklin appears to have based his recommendations on Ms. Carter's reported symptoms and an Echo from December 2, 2010, revealing an ejection fraction of 26 percent. R. 423-24, 470-71, 484-85. The ALJ reasonably concluded that the written opinions from Dr. Franklin were not supported by Ms. Carter's medical record and were based on an incomplete assessment of Ms. Carter's abilities. Tellingly, Dr. Franklin's November 30, 2011, RFC Questionnaire did not mention the most recent Echo or discuss how Ms. Carter's surgery could affect her RFC. R. 484-85.

Second, substantial evidence supported the ALJ's conclusion that Dr. Franklin's opinions were inconsistent with other substantial evidence in the record. Specifically, his opinions conflicted with treatment by Dr. Ridley, Ms. Carter's cardiologist who Ms. Carter visited on many occasions. On each visit, Dr. Ridley tracked her cardiomyopathy, recorded her symptoms, provided medical counseling, and reviewed her medications. Additionally, Dr. Franklin's assessment conflicted with the two state agency doctors who determined that Ms. Carter was not completely disabled. R. 100, 126-27. Appropriately, those doctors also noted that an opinion that Ms. Carter could not work was an issue reserved to the Commissioner. R. 100, 129. The ALJ also noted that Dr. Franklin failed to consider the improvement in Ms. Carter's condition with treatment. Dr. Franklin consistently based his opinions on outdated medical tests and did not provide the same detailed account of his opinions as, for example, did Dr. Ridley.

For the above reasons, the undersigned FINDS that the ALJ did not err by giving no significant weight to Dr. Franklin's opinions.

**C. The ALJ's credibility assessment of Ms. Carter was proper.**

Preliminarily, in *Mascio v. Colvin*, the Fourth Circuit recently discussed whether an ALJ's comparison of a claimant's alleged functional limitations to the claimant's residual functional capacity, as opposed to her pain and other symptoms, was in error. 780 F.3d 632, 636 (4th Cir. 2015). In light of this decision, the undersigned directed the parties to file supplemental pleadings discussing *Mascio*. ECF No. 21. In *Mascio*, the Fourth Circuit rejected a per se rule, and instead held that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The Fourth Circuit specifically noted that even if the ALJ did compare the claimant's functional limitations to the claimant's residual functional capacity, the error would be harmless if the ALJ did, in fact, properly analyze the claimant's credibility elsewhere. *Id.* at 637. Indeed, the court remanded in part because the ALJ's analysis "gets things backwards" when the ALJ wrote: "'the claimant's statements . . . are not credible to the extent they are inconsistent with the above residual functional capacity assessment.'" *Id.* at 637. However, "[t]he ALJ's error would be harmless if he properly analyzed credibility elsewhere." *Id.* at 639.

Here, the ALJ wrote: "the claimant's statements . . . are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 48. Initially, this language may appear in conflict with the court's ruling in *Mascio*, but the error was harmless because "[u]nlike the ALJ in *Mascio*, the ALJ here clearly considered Plaintiff's limitations, and

developed a wholesome record on how those limitations conflicted with the objective medical evidence." *Sharp v. Colvin*, No. 3:14CV340-HEH, 2015 WL 1517416, at *4 (E.D. Va. Apr. 1, 2015) (citing *Mascio*, 780 F.3d at 639); *see also Long v. Colvin*, No. 1:13CV659, 2015 WL 1646985, at *1 (M.D.N.C. Apr. 14, 2015) ("Although the [boilerplate] language used by the ALJ suffers some of the similar defects as in *Mascio*, the ALJ in this case 'properly analyzed [Plaintiff's] credibility elsewhere,' something the Fourth Circuit recognized would render this 'Bjornson error' harmless.") (quoting *Mascio*, 780 F.3d at 639).

The ALJ compared Ms. Carter's alleged limitations to the medical record, and this is what *Mascio* requires. *Id.* at 639 ("[T]he ALJ should have compared Mascio's alleged functional limitations from pain to the other evidence in the record, not to Mascio's residual functional capacity."). Unlike in *Mascio*, the ALJ here cited evidence from the record to support his finding of sedentary work and announced the weight that he gave to various RFC assessments, including Ms. Carter's own statements, her primary physician, and the state agency doctors. R 48. Additionally, the ALJ's written opinion does not suffer from inadequacies that frustrate meaningful review. "While it might be argued that [the ALJ] did not parse and compartmentalize the functional limitation discussion, a reviewer can readily ascertain the ALJ's thinking as it is evident in his discussion of the claimant's testimony and the other evidence of record. Under these circumstances, nothing more is required." *Mollett v. Colvin*, No. CIV.A. 2:13-28018, 2015 WL 1481842, at *3 (S.D.W. Va. Mar. 31, 2015). Accordingly, the undersigned FINDS that the ALJ properly considered Ms. Carter's alleged limitations in comparison to the medical record.

Turning then to Ms. Carter's third claim of error, Ms. Carter argued that the ALJ failed to apply the appropriate legal standards in assessing her credibility. ECF No. 15 at 19. In

determining a claimant's RFC, the ALJ considers (1) impairments supported by the objective medical evidence and (2) impairments based on the claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 586, 594 (4th Cir. 1996). Under the *Craig* test, the ALJ must first determine whether there is an underlying medically-determinable physical or mental impairment that reasonably could produce the pain or symptoms. *Id.* If so, then the second step requires the ALJ to evaluate the claimant's statements about the intensity and persistence of the pain and the extent to which it affects or limits the ability to work. *Id.*

When considering the claimant's subjective complaints and allegations of symptoms and functional limitations, the ALJ must make a credibility assessment of the intensity of the symptoms to determine the true degree of limitation. *Id.*; see also 20 C.F.R. § 404.1529(a); SSR 96-7p. SSR 96-7p directs the ALJ to consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Throughout the analysis, the ALJ must sufficiently explain the conclusions, including the weight assigned to the relevant evidence, so that a reviewing court can evaluate the basis for the final decision. *Ivey v. Barnhart*, 383 F. Supp. 2d 387, 389-90 (E.D.N.C. 2005) (citing *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977)). However, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations

concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989-90 (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)).

Here, after initially determining that there was an underlying medically determinable physical or mental impairment that reasonably could produce symptoms, the ALJ found that "the record does not support the degree of limitation [Ms. Carter] alleges," when considered in the context of her medical treatment notes, treatment history, and her own testimony about her daily activities. R. 45-48. The ALJ noted that Ms. Carter's medical record documented her regular denial of symptoms, such as "shortness of breath, chest pain, chest tightness and syncope." R. 48. In addition, the ALJ found that Ms. Carter's "complaints are also inconsistent with the follow-up treatment records after she underwent placement of a defibrillator," which show an improvement in medically objective measurements, such as her ejection fraction and left ventricular systolic dysfunction. *Id.* The ALJ also considered that Ms. Carter's medical records "routinely showed a normal heart rate and rhythm and clear lungs." *Id.* In addition to these factors, the ALJ also observed that Ms. Carter delayed her own treatment by waiting over a year to obtain the AICD, failing to consistently take medication, and continuing to smoke against the advice of her cardiologist. *Id.*

Ultimately, the ALJ found that Ms. Carter's "reported restrictions in daily activities are not consistent with the documented improvement in her symptoms with treatment, with her denial of chest pain and shortness of breath in multiple treatment records or with the conservative treatment she has required since placement of the defibrillator." *Id.* Because the ALJ concluded that Ms. Carter's testimony was inconsistent with the totality of the medical evidence, he therefore gave her testimony less weight and credibility. *Id.*

After a review of Ms. Carter's testimony and the medical evidence in the administrative record, the undersigned FINDS that the ALJ's decision and credibility determination was supported by substantial evidence, and that the ALJ provided a sufficient explanation to support his conclusions that Ms. Carter was not disabled and could in fact perform sedentary work with the various limitations. *See Ivey v. Barnhart*, 393 F. Supp. 2d 387, 389-90 (E.D.N.C. 2005) (citation omitted).

**D. The ALJ properly relied on the Vocational Expert's testimony.**

In the fourth claim of error, Ms. Carter argued that the ALJ erred by relying upon the Vocational Expert's testimony "in response to an incomplete hypothetical question." ECF No. 15 at 21. First, Ms. Carter asserted that because the ALJ failed to properly assess her RFC and weigh her credibility, the Step 5 determination was unsupported by the substantial evidence. *Id.* Second, Ms. Carter asserted that "the hypothetical question did not reflect the limitations contained in the opinions of Dr. Franklin." *Id.*

"In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe. *Benerate v. Schweiker*, 719 F.2d 291, 292 (8th Cir. 1983); *Carter v. Apfel*, No. 5:97-600, 2001 WL 40795 (S.D. W. Va. Jan. 17, 2001).

During the hearing, the ALJ posed the following hypothetical to the VE:

> Assume that she can perform the full range of sedentary work except the so-called postural activities should be occasional only, no pushing or puling greater than 10 pounds with either the upper or lower extremities; no exposure to extremes of temperature, high humidity, chemicals or fumes; and because of her pacemaker, she should not work in close proximity to any large electric motors or any other equipment that would have electromagnets. Let me stop there for now. With that profile, would there be any other work such a person could do?

R. 90. The VE responded that there were 358 regional jobs as a medical clerk, 500 regional jobs as an appointment clerk, and 300 regional jobs as a surveillance system monitor that Ms. Carter could perform given the hypothetical. R. 91. The ALJ then modified the hypothetical to consider the effect of an inability to "complete a full eight-hour day without an unpredictable number and length of rest periods." R. 92. The VE responded that there would be no full-time work available under that condition. *Id.*

The ALJ's hypothetical must be based on the credible medical evidence in the record. *See Hammond v. Heckler*, 765 F.2d 424, 425-26 (4th Cir. 1985). Contrary to Ms. Carter's argument, the ALJ is not obligated to include restrictions in the hypothetical question to the VE that exceed the credible limitations of Ms. Carter, as established in the RFC determination. *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (holding that an ALJ's hypothetical question is valid when it reflects the RFC finding that was supported by substantial evidence in the record); *see also Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (finding that an ALJ's hypothetical question must only include those severe impairments or limitations for which there is support in the record).

Consequenty, for the reasons stated in Sections V(B), V(C), and this Section V(D), *supra,* the undersigned FINDS that the ALJ's hypothetical was based on substantial evidence in the record, and therefore, the ALJ properly relied on the VE's testimony.

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Ms. Carter's motion for summary judgment, ECF No. 15, be **DENIED**; the Defendant's motion for summary judgment, ECF No. 18, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this report and recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. The United States District Judge shall make a de novo determination of those portions of this report and recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this report and recommendation to the counsel of record for the Plaintiff and Defendant.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
June 24, 2015

**CLERK'S MAILING CERTIFICATE**

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. John E. Basilone
Goss & Fentress
735 Newtown Road, Suite 100
Norfolk, Virginia 23502
Counsel for Plaintiff

Mr. Howard David Olinsky
Olinsky Law Group
300 South State St., Suite 420
Syracuse, New York 13202
Counsel for Plaintiff

Mr. Kent Porter
Assistant United States Attorney
United States Attorney's Office
101 West Main Street
Norfolk, Virginia 23510-1671
Counsel for Defendant

Ms. Susan Lynn Watt
Assistant United States Attorney
United States Attorney's Office
101 West Main Street
Norfolk, Virginia 23510-1671
Counsel for Defendant

Fernando Galindo
Clerk of Court

Deputy Clerk
Date: 6/24/15